Filed 10/13/15  P. v. Wedel CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DUSTIN WILLIAM WEDEL,<br><br>Defendant and Appellant. | F068557<br><br>(Super. Ct. No. BF137352A)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Kenneth C. Twisselman II, Judge.

Michael B. McPartland, under appointment by the Court of Appeal; Williamson Law Office, and Airene Williamson for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Jesse Witt, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Defendant Dustin William Wedel was charged with second degree murder, assault on a child by means of force likely to produce great bodily injury resulting in death, and willful harm or injury to a child likely to produce great bodily harm or death.  (Pen. Code,

§§ 187, subd. (a), 273ab, subd. (a), 273a, subd. (a).)[1]  Following jury trial, defendant was convicted of all counts.  He was sentenced to 15 years to life for murder, 25 years to life for assault of a child resulting in death—stayed pursuant to section 654—and a six-year term for willful cruelty to a child.  On appeal, he contends there is insufficient evidence of his conviction for willful cruelty to a child.  And, further, that the trial court should have stayed imposition of sentence on that count.  We disagree and will affirm.

## SUMMARY OF MATERIAL FACTS

Stormie Roberts was caring for three-year-old James Fanshier (James), although she was not his biological mother.  Rather, Roberts had dated James's biological father, Eavan Fanshier, for a few years, but when the two broke up, Fanshier, who had sole legal and physical custody of James, thought it best that Roberts continue to care for his son.  Roberts loved James as though he were her own son.  James called her "mama."

When defendant and Roberts began dating and living together, James was still a happy, active child.  Defendant cared for James while Roberts was at either of her two jobs.  He also cared for Roberts's nieces and nephews as well when her sister Trishia Hance was at work.  James's young cousins, Chelsey B. and Brock W. (ages 13 and 11, respectively, at the time of trial), soon observed defendant physically abuse James while he was in his care, and Chelsey observed that James developed an odd behavior whenever he was around defendant.  Specifically, Chelsey observed defendant hit James really hard in the stomach with his fist four or five times; James cried.  She also saw defendant shove his fingers into James's side and neck; defendant was mad and James was crying.  On yet another occasion, Chelsey saw defendant pick James up off the ground by one of his wrists; defendant was angry and told James to shut up.  James was crying and Chelsey told defendant to put James down, but he did not do so.  Chelsey also observed defendant force James to stand in a corner while defendant shook James back and forth by his hoodie, jerking James around.  Brock, too, observed defendant sticking

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

his fingers into James's ribs on one or two occasions. He also saw defendant pick up James off the ground by one of his wrists; Brock said that occurred on at least 10 occasions. Further, Brock testified he observed defendant hit James with a belt. Chelsey noted James began rubbing or tapping his fingers together and was quiet and scared when defendant was around. Chelsey did not think James liked being alone with defendant.

An incident occurred a few months prior to James's death at a friend's home where defendant and James were to join others for an outing to a park while Roberts was at work. Charlee Nord observed defendant pulling on and flicking James's ears; James was crying and no one else was present. Nord took James from defendant and settled him before leaving him alone to go into another room. A short time later, Nord found James alone with defendant in the living room. When a call came from James's biological father, defendant took James to another room; James was crying. Johnale Waterman and Nord observed bruising to James's face and ears, and Waterman photographed the injuries with her phone. Waterman asked defendant what had happened to James. Defendant told Waterman he had "whooped" James in the bath because he was crying. When James and defendant had first arrived, James did not have any injuries. Further, defendant admitted to the women that he hit James in the bath because he was crying; James didn't like getting water in his face. Waterman took photographs of James and sent one to Roberts. Roberts left work and sought out James. Roberts was aware the other adults present believed defendant was responsible for James's injuries, but when Roberts asked James what had happened, he told her he had fallen on the rocks and sticks in the backyard. Defendant told Roberts the same.

On January 23, 2011, Roberts got up at 4:00 a.m. and went to work from 5:00 a.m. to 10:00 a.m. James was ill and a number of family members, including Roberts, had recently suffered from the flu earlier that week. Roberts asked her mother to take food over for James because he had not been eating much and she hoped he would enjoy one of his favorite foods: biscuits and gravy. Glenda Porter delivered the food between 8:00

3.

and 9:00 that morning. She noted James was sitting up on the bed, looking pale; defendant was lying on the bed. James did not greet her as was his custom. When Roberts got home from work, defendant advised her James had been vomiting and had diarrhea. James slept most of the day and complained his stomach hurt, but Roberts figured he was suffering from the flu. James did not eat the dinner Porter brought by later, and she and Roberts discussed taking James to urgent care the following morning. Roberts put James to sleep about the same time she and defendant went to bed. At some point she heard a noise from James; when defendant turned on the light, Roberts noted James's lips were blue and he was not breathing.

Picking up James, Roberts ran outside the house and ultimately flagged down a passing sheriff's deputy. The officer performed cardiopulmonary resuscitation efforts, but shortly after medical personnel arrived, James was pronounced dead.

A subsequent autopsy revealed James was covered in bruises, of varying ages, to his face, chest, arms and legs. There was also an incised wound or sharp force injury to James's penis. The internal examination revealed a number of broken ribs, some past breaks since healed, and others broken completely in half. There was a contusion on James's left lung and a fracture to his right radius and ulna. The most significant injury James suffered was a transected duodenum. This type of injury is caused by an extensive amount of force and could be caused by a blow to the abdomen. The duodenal injury caused a spill of the gastric contents into James's abdominal cavity; peritonitis set in and caused multiple organ failure within a six- to 12-hour period. It would have been extremely painful; symptoms would include vomiting, diarrhea, fever or chills, lethargy, and shock. James's death was caused by multiple blunt force injuries and it was ruled a homicide.

## DISCUSSION

### 1.  The Evidence Was Sufficient

Defendant contends the evidence is insufficient to support his conviction for willful cruelty to a child because it is only circumstantial and, thus, because there is more than one reasonable interpretation of that evidence his conviction must be reversed.  The People maintain there was both direct and circumstantial evidence to support defendant's conviction on count 3.  We agree with the People.

#### A.  The Law

When considering a challenge to the sufficiency of the evidence to support a judgment, we review the record in the light most favorable to the judgment and decide whether it contains substantial evidence from which the finder of fact could make the necessary finding beyond a reasonable doubt.  We presume every inference in support of the judgment that the finder of fact could reasonably have made.  We do not reweigh the evidence or reevaluate witness credibility.  We cannot reverse the judgment merely because the evidence could be reconciled with a contrary finding.  (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.)

#### B.  Our Analysis

Here, the jury was instructed that "[d]irect evidence is evidence that directly proves a fact.  It is evidence which by itself, if found to be true, establishes that fact." (CALJIC No. 2.00.)  As we stated in *People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1187: "Circumstantial evidence involves a two-step process—first, the parties present evidence and, second, the jury decides which reasonable inference or inferences, if any, to draw from the evidence—but direct evidence stands on its own.  So as to direct evidence no need ever arises to decide if an opposing inference suggests innocence. [Citation.]"  Further, eyewitness evidence is direct evidence.  (*People v. Baldwin* (1979) 97 Cal.App.3d 396, 401.)  In this case, Chelsey B., Brock W., and Charlee Nord provided

eyewitness testimony concerning a number of instances of child abuse inflicted upon James by defendant. Hence, their testimony is direct evidence.

More specifically, Chelsey testified to observing defendant forcefully punch or hit James in the stomach four or five times. Chelsey also observed defendant shoving his fingers into James's side and neck, causing the child to cry. Brock observed the same behavior. Additionally, Chelsey observed defendant pulling James up off the ground by his wrist, causing James to cry and Chelsey to tell defendant to put James down. Brock testified to observing the same behavior by defendant on at least 10 occasions. Moreover, Chelsey observed defendant shake James by an article of clothing, and James was jerked back and forth by defendant while he was made to stand in a corner. Finally, Brock once observed defendant hit James with a belt. Nord observed defendant pulling on and flicking James's ears.

Significantly, all of these injuries occurred prior to January 23, 2011, and within the time period alleged in the information. The testimony of a single witness—unless physically impossible or inherently improbable—is sufficient for a conviction. (Evid. Code, § 411; *People v. Young* (2005) 34 Cal.4th 1149, 1181.) There is nothing either physically impossible or inherently improbable about either Chelsey, Brock, or Nord's testimony. The trier of fact makes credibility determinations and resolves factual disputes. (*People v. Estrella* (1995) 31 Cal.App.4th 716, 724–725.) We will not substitute our evaluation of a witness's credibility for that of the fact finder. (*People v. Vazquez* (2009) 178 Cal.App.4th 347, 352.) Clearly, the jury believed the testimony proffered by these eyewitnesses, and we will not reevaluate their credibility on appeal.

Notably, the acts described by Chelsey and Brock comport with the autopsy findings, to wit: acute, subacute, and chronic injuries inflicted upon James. There was extensive bruising to his face, chest, arms, and legs. Several of James's ribs were completely broken, and others had healed from earlier injury. James's right wrist was

fractured and had been injured previously.  There were also abrasions found on James's left ear during the external examination that were consistent with Nord's testimony.

In sum, we have reviewed this record in its entirety and we find there is substantial evidence to support the jury's finding of defendant's guilt as to the infliction of willful cruelty to a child, or felony child abuse.  (*People v. D'Arcy*, *supra*, 48 Cal.4th at p. 293.)

## 2.    Section 654

Defendant next contends the trial court erred in sentencing him to a six-year term on count 3, felony child abuse.  Specifically, he argues he was convicted of murder, assault on a child resulting in death, and felony child abuse based upon the single act of assaulting James with force likely to produce great bodily injury or death on the morning of January 23, 2011.  Even if all three convictions were not based on the same act, he argues all were committed pursuant to a single intent and objective.  Hence, the sentence should have been stayed.  The People assert the trial court properly imposed sentence on count 3, and section 654 is not applicable because there were separate acts of abuse inflicted at different times, meaning the abuse was divisible in time.  We conclude section 654 does not preclude imposition of the six-year term imposed below.

### A.    The Law

Section 654, subdivision (a) provides as follows:

> "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."

The statute "precludes multiple punishment for a single act or omission, or an indivisible course of conduct.  [Citations.]"  (*People v. Deloza* (1998) 18 Cal.4th 585, 591.)  If a defendant is convicted under two statutes for one act or indivisible course of conduct, section 654 requires the sentence for one conviction be imposed and the other imposed and then stayed.  (*Deloza*, at pp. 591–592.)  "Section 654 does not allow any multiple

punishment, including either concurrent or consecutive sentences. [Citation.]" (*Id*. at p. 592.) The correct procedure is to impose a sentence for each count and enhancement and then to stay execution of sentence as necessary to comply with section 654. (*People v. Duff* (2010) 50 Cal.4th 787, 795–796.) The statute serves the purpose of preventing punishment that is not commensurate with a defendant's criminal liability. (*People v. Hall* (2000) 83 Cal.App.4th 1084, 1088, disapproved on other grounds in *People v. Correa* (2012) 54 Cal.4th 331, 343-344.)

"Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19, disapproved on other grounds in *People v. Correa*, *supra*, 54 Cal.4th at p. 333; see *People v. Hairston* (2009) 174 Cal.App.4th 231, 240.)

> "If [a defendant] entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct." (*People v. Beamon* (1973) 8 Cal.3d 625, 639.)

## B.     The Sentence Imposed

Following consideration of the probation officer's report, the People's sentencing statement, and the parties' arguments, the court stated as follows:

> "THE COURT: … I am going to make the following findings and orders:

> "With regard to circumstances in mitigation, I find none.

> "Regarding circumstances in aggravation, I find the following: No. 1, the defendant's prior convictions as an adult and sustained petitions in juvenile delinquency proceedings are numerous. No. 2, the defendant's prior performance on juvenile probation, deferred entry of judgment, … Section 1210.1 probation, and misdemeanor probation was unsatisfactory in that he continued to reoffend and failed to abide by terms and conditions.

8.

No. 3, the defendant had two active misdemeanor warrants for his arrest when he committed the instant offense. That's per [California Rules of Court,] Rule 4.408. And, finally, No. 4, the defendant took advantage of a position of trust or confidence to commit the offense, under again Rule 4.421.

"With regard to sentencing options, I find the defendant qualifies for punishment in CDCR based on the current offenses.

"I find the defendant to be statutorily ineligible for a grant of felony probation except in unusual circumstances per … Section 1203 Subdivision (e)(3) in that he willfully inflicted great bodily injury ultimately resulting in the victim's death. Upon review of Rule of Court 4.413, the Court does not find this case to be unusual for that purpose.

"I also find the defendant to be clearly an unsuitable candidate for a grant of felony probation given the serious circumstances in this case. He has shown through his actions that he is an extreme danger to the community, and a prison sentence is justified.

"With regard to the sentencing justification, I find the punishment as to Count 1 is an indeterminate term of 15 years to life. I find the punishment as to Count 2 is an indeterminate term of 25 years to life. I agree that Count 2 should be the selected term carrying the greatest punishment.

"I am going to find that the punishment as to Count 1 should be stayed pursuant to … Section 654 in that counts 1 and 2 involve the same set of operative facts.

"*I do not find that Count 3 should be stayed under … Section 654. I do not find it involves the same set of operative facts as contained in Count 2.*

"*And I also note that Count 3 should be consecutive per Rule of Court 4.425 in that the crime in Count 3 involves separate acts and at different times.*

"As to Count 3 I find that the aggravating factors preponderate, justifying imposition of the upper term. [¶] … [¶]

"Count 3. Probation is denied. Defendant is sentenced to the Department of Corrections for the upper term of six years. The Court finds that the term should be served consecutive to the sentence imposed in Count 2.…

"So the defendant is sentenced to a total term of 25 years to life plus an additional six years." (Italics added.)

## C.    Our Analysis

Section 654 does not bar imposition of the upper term of six years on count 3 in this matter, hence, the trial court did not err.

Initially, we note the record plainly reveals the trial court found the abuse alleged in counts 1 and 2 was separate and distinct from that alleged in count 3.

Moreover, as to count 3, the evidence was sufficient to support the trial court's implicit finding of multiple offenses, independent of, and not merely incidental to, each other. Based upon the testimony given, and in particular given by Chelsey and Brock, it was reasonable for the court to conclude defendant committed separate offenses between the period of November 2010 and January 2011, excluding January 23, 2011. Those offenses were independent of one another, even though the violations shared common acts or were parts of an otherwise indivisible course of conduct. (*People v. Green* (1996) 50 Cal.App.4th 1076, 1084-1085.) Defendant was observed to hurt and abuse James on numerous occasions, sometimes punching the three-year-old child hard in the stomach, other times pulling him up off the ground by his wrist, and yet other times shoving or poking his fingers into James's ribs or side, or neck. All of these actions caused James to cry.

It was reasonable to conclude that not all of the incidents of child abuse committed over about three months by defendant constituted an otherwise indivisible course of conduct incidental to the violent act that killed James on January 23, 2011. There was sufficient evidence that, before James's death, defendant committed separate, independent acts of child abuse not intertwined with the conduct leading to James's death on January 23, 2011. Thus, there was no violation of section 654 in imposing consecutive sentences for second degree murder and felony child abuse as separate, divisible offenses.

Finally, we briefly note and reject defendant's argument that his jury trial rights were violated pursuant to *Apprendi v. New Jersey* (2000) 530 U.S. 466.  Similar arguments have already been decided against defendant.  (*People v. Retanan* (2007) 154 Cal.App.4th 1219, 1229 [weight of California authority holds *Apprendi* rule is not applicable to decisions made under § 654]; *People v. Cleveland* (2001) 87 Cal.App.4th 263, 269–271 [§ 654 is sentencing reduction statute, so *Apprendi*'s rationale does not apply]; *People v. Solis* (2001) 90 Cal.App.4th 1002, 1022 [same].)

## DISPOSITION

The judgment is affirmed.

_____

PEÑA, J.

WE CONCUR:


_____

LEVY, Acting P.J.


_____

KANE, J.

11.